Good morning. May it please the court, David Zuckerman representing the petitioner Stephen Sherer. And I'm hoping to save about five minutes for rebuttal. But you know how it goes. In 1990, Jamie Sherer disappeared. Ten years later, Stephen Sherer was tried and convicted of killing her. The evidence against him was entirely circumstantial. Jamie's body was never found. There was no eyewitness to the crime. No murder weapon was identified. And Steve consistently maintained his innocence. In the interest of time, I'll rely on my briefs regarding the sufficiency of the evidence claim. And I'll go directly to the issue of ineffectiveness of trial counsel regarding the dog tracking evidence. Sherer's trial attorneys presented the testimony of dog tracker Richard Sherman because they interpreted his report as showing that Jamie left her car in a church parking lot and walked through a wooded area to a bus stop. That scenario negated the state's theory that Jamie drove to the Sherer home, that Stephen killed her there, and that Stephen then disposed of her body and left her car in the church lot as a ruse. The scenario... I was just curious. I couldn't see from the record. What was the precipitating... Obviously, he wasn't prosecuted for some time after her disappearance. And then in 1997, I guess she was legally determined dead. What was the kind of the final straw precipitating evidence that caused him to be prosecuted? As far as I can tell or recall, Your Honor, it was simply different prosecutors taking another look at the case and deciding to go forward with it. Because, you know, sometimes someone gets drunk and then they make an admission or something and it pushes the circumstantial evidence over the top. Certainly, there was never any admission. When the case was charged, as I discussed in my briefs, and when it came very close to the time of trial, a very highly publicized trial, it was then that some people came out of the woodwork and started claiming that they had heard incriminating statements long before. Now, in terms of Tweedy, Tweedy was a volunteer or something along those lines. Is that correct? She, yes, she was also a commissioned officer for Kittitas County. But she ran, I believe it was volunteer dog tracking services solely for the purpose of law enforcement. Well, if we look at that argument, number one, there has to be that evidence, we have to be convinced it was critical, correct, the dog tracking evidence, in order for your claim to prevail on that. But I'm also, you have the Brady claim, and I'm wondering why doesn't the Brady claim fail in light of the district court's determination that neither the prosecutor nor any law enforcement officers had access to Tweedy's report? Well, Your Honor, I'm relying on the law established in Kyle's v. Whiteley by the U.S. Supreme Court, where the court said that anyone acting on the government's behalf in the investigation, including the police, but not limited to the police, gives rise to the, their information gives rise to a Brady obligation. So in this case, we have Jan Tweedy, who works only for law enforcement, is called out by law enforcement to assist them in this tracking, and as the testimony at the evidentiary hearing showed, is, was in fact required, law enforcement was required to maintain her report, although that apparently did not happen. Well, isn't that important here? In other words, nobody connected with the prosecution or law enforcement had a report, right? So how could there be a Brady violation if there's no report? As I said, my position is that she was acting on, she was assisting law enforcement, she was acting on the government's behalf, in assisting the government, to use the words of Kyle's v. Whiteley. I do agree that I think the ineffective assistance claim is clearer and simpler in this case, after the evidentiary hearing. So you feel that that's your strongest argument, your strongest point of the case? I think, I think it's most clear that the, that based on admissions of all concerned at this point, including the trial attorneys. Which one are you talking about? You have two ineffective assistance claims, right? I mean, one has to do with Tweedy, the other has to do with the other tracker, right? Well, that's true. Or you consider them all just the same claim? I, I suppose you could look at it either way. I agree that there were, there are two aspects of ineffectiveness, of deficient performance. First of all, they decided at the last minute to call this dog tracker, Richard Sherman, whose report they have. Under Washington law and court rules, they have every opportunity to interview him all they want. They do this very brief interview, and the defense attorney never asks him, what conclusion do you draw from this tracking that occurred? By all accounts, by, by, by both the attorney's account and Sherman's account, they didn't ask that question. And as any good trial lawyer knows, you don't put someone on the stand if you don't know what they're going to say. The other point which is related is that Sherman's report in itself refers counsel to Jan Tweedy's, that Jan Tweedy wrote her own report and also indicates that there would be more detail there. And in fact, Sherman was relying on what he recalled of what Tweedy did. Well, clarify for me in the record, if, it appears that the prosecutor only referred to the dog tracking evidence briefly in his rebuttal closing argument. How do we determine whether the evidence was critical to Mr. Scheer's conviction? Well, first of all, I don't think of it as brief at all. It went on for several pages of transcript. But the prosecutor said it was critical. She told the juror, the defense had made some really good points in closing argument about how the State was relying on all of these disreputable witnesses who go ten years without mentioning these incriminating facts and then suddenly when a reward is posted, come up with something. And she comes back in her rebuttal argument and says, oh, no, no, no. We're not relying on disreputable people. We're relying on the salt of the earth, these dog trackers and their wonderful dogs. And this, and she says to the jury, you know, and this evidence is critical to the case. And the dog tracking was the last evidence the jury heard live. It was also the last word they got from the prosecutor about how important that was. And, of course, we also have to keep in mind. When you talk about how critical it was, are you addressing the same point as, you know, under Strickland you have to show, assuming the performance was substandard, you have to show that it prejudiced the defense? Correct. Is that the same thing you mean when you say it's critical? Yes, I believe. That it was prejudicial to the defense? No, it made a difference in the outcome of the case? Clearly. Because other than that, the evidence was so thin against Shearer, as evidenced by the fact they wait ten years to charge him, as evidenced by the fact the jury, even with the debacle of the dog tracking evidence, from the defense point of view, spent an entire week deliberating before they convicted him. So, yes, I do believe that it was, that that evidence clearly was critical to the case. Because, after all, what the jury heard was apparently conclusive evidence that Stephen Shearer had walked from this parking lot where Jamie's car was parked through a wooded area to a bus stop. I mean, that is terribly incriminating evidence in this case. Why would he drive her car to this parking lot and leave it there and then sneak away to a bus stop unless he was trying to pull some kind of a ruse to make it look like Jamie had disappeared on her own rather than that he killed her? On the other hand, we now know the truth, which is that the dog was following Jamie's scent, which is totally inconsistent with Stephen killing her, with the State's whole theory of the case being that he lures her to the house, kills her there, which would make, and then he leaves the car in the shoreline parking lot. If he killed her at the house, it would be impossible for Jamie to then have driven to the shoreline lot and walked through the woods. So I think the correct interpretation of the dog tracking evidence is absolutely critical in both directions. Perhaps I should say. Do you want to re-serve? Thank you. Thank you. May it please the Court, my name is Greg Rosen. I'm an Assistant Attorney General. I represent the Respondent in this matter. Shearer is not entitled to relief because he fails to meet the standard under Harrington v. Richter for relief. He fails to show that there was no possibility fair-minded jurists could disagree that the State Court's decision is conflicted with Supreme Court precedent. Well, let's, you know, if I make the argument for appellant here that he claims that this is an unusual case because there's no body and there's no direct evidence that it's a purely circumstantial evidence case, why wasn't Mr. Shearer denied an effective assistance of counsel when his trial attorney called Mr. Sherman as a witness without properly interviewing him first? Well, I would, as to the last part of the Court's question, Your Honor, I would respectfully dispute the fact that he was not adequately interviewed. Mr. Camille, one of the defense counsel for Shearer, interviewed Mr. Sherman twice, once extensively over the phone. And an objectively reasonable attorney, without the benefit of hindsight, could have interpreted Sherman's report as seeing that all of the dogs were tracking Jamie's scent. And it should be noted that Mr. Sherman's direct examination that he did with Mr. Camille at trial came out exactly as Mr. Camille thought it would. It was only on cross-examination. So then he got surprised. On cross-examination by the prosecutor. Which isn't the first time that's ever happened, and anyone that has done trial work knows that surprise, cross doesn't always go as well as direct. Let's put it that way. So I guess once he was surprised, what should he have done? Well, I think what they should have done is what they did, is that Mr. Mayer, who considers himself to be the more aggressive, the more competent cross-examiner, cross-examined Mr. Sherman the next day. As to his conclusions or as to his testimony on cross-examination. And did not shake Mr. Sherman from the opinions that he offered on cross-examination. But counsel acted reasonably by putting on Mr. Sherman. He was adequately interviewed. There was a surprise. As the court pointed out, surprises happen in trials all the time. And counsel could not have foreseen that that would have occurred. So how important was this evidence? That's part of an ineffective assistance of counsel claim. So from your perspective, we heard what Mr. Zuckerman's position was relative to the importance. What's your position? This evidence was not important to the state's case, Your Honor. When this court reviews the totality of the evidence, the court will find that the dog-tracking evidence wasn't a centerpiece for either the state or the defense. And if it was so critical to the state's case, why didn't the state offer the dog-tracking evidence in its case in chief? The only reason that Mr. Sherman testified is because defense counsel believed that the state was not putting on dog-tracking evidence because it was exculpatory in some fashion. And they seized what they believed to be a golden opportunity by putting on that evidence. So the state never introduced the dog-tracking evidence in its case in chief at all. And the prosecutor's comments in her rebuttal closing that this was critical evidence, I would respectfully submit, was argument. And when the totality of the evidence is reviewed, I would respectfully submit that this dog-tracking evidence was relatively meaningless when the court considers the entirety of the inculpatory evidence that was offered in this case. And the court can review that in the magistrate's report and recommendation, for example, at ER 63-67. The Washington Court of Appeals found there was overwhelming evidence. What would you say, 63 to 57? 63 to 67, Your Honor. That is where the magistrate judge recited in fairly quick form in only four pages the inculpatory evidence that was presented during Scheer's trial. The Washington Court of Appeals found there was overwhelming evidence that Scheer caused Jamie's death and did so with premeditated intent. The magistrate judge characterized the evidence against him as overwhelming and voluminous. The district judge found the overwhelming nature and amount of circumstantial evidence presented at trial made the evidence more than sufficient to find Scheer guilty beyond a reasonable doubt. And the evidence, rather than the court taking my word for it, Scheer knew of the location of Jamie's car prior to the police knowing about it. There was evidence presented at trial that Jamie dearly loved her two-year-old son, Tyler, and there was no credible reasoning given at trial as to why Jamie would have abandoned that boy who she loved so much. Jamie's car was found unlocked, the alarm was turned off, her driver's seat was pushed all the way back, and Jamie was a very petite woman, barely five feet tall as I understand it. And she'd recently installed a CD system, but the alarm was turned off. And the wedding ring that she found that she was found, that she swore she would never return, and a duffel bag was found in the car with no women's underwear. Well, and then what, he was seen somewhere with her underwear on his head? No, Your Honor. There was testimony by Carbon Cubine who testified that she had an interaction with Scheer at a bar within a few weeks of Jamie's disappearance. And she testified that she saw Scheer wearing Jamie's underwear around the upper part of his arm and declaring, and I'm quoting, the bitch is gone, end quote, in jubilant fashion. And she testified, Ms. Cubine, that he almost seemed to be celebrating the fact. There was also testimony at Scheer's. Now you're addressing the sufficiency of the evidence here, right? Well, not purely sufficiency of the evidence. I'm addressing sufficiency of the evidence. But also how important the tracking evidence was relative to the strength of the rest of the case. That's correct, because it's Scheer's burden to show that there is a reasonable probability that the outcome of this case would have been different but for counsel's alleged deficiencies. Let me take you to the Brady claim. Yes, Your Honor. Would Mr. Scheer have a valid Brady claim if a court determined, A, that Ms. Tweedy had an obligation to submit a report to law enforcement personnel, and B, law enforcement personnel had an obligation to obtain Ms. Tweedy's report, but in fact the report was not forwarded to the police? No, Your Honor. There is no legal obligation that I'm aware of that law enforcement has an affirmative duty to go out and seek the report. Am I understanding that's what the appellant is claiming, or am I misinterpreting that? I believe that's what the appellant is claiming. But what the appellant is claiming, and I say this respectfully, is an attempt to finesse the problem that there is no there there as far as this Brady claim. The district court found, after a two-day evidentiary hearing,  that you can't suppress or fail to disclose something you don't have. And that's the no there there. And that should end the Brady analysis right there. The attempt to say, well, Ms. Tweedy was called out by law enforcement, which is incorrect, actually. She was called out by Richard Sherman. And that law enforcement has certain obligations doesn't establish or avoid the fact that neither the prosecutor nor law enforcement ever possessed Tweedy's report. There's no claim here. Now, what evidence, if any, is there in the record to support the prosecutor's statement following Mr. Sherman's testimony that Ms. Tweedy's report would support Mr. Sherman's testimony? Marilyn Brenneman made that statement to the trial court during that colloquy. The support for that, Your Honor, is at SCR 1462-63, which was Jan Tweedy's testimony at the evidentiary hearing. And during that testimony, Ms. Tweedy testified that she told Detective Michael Faddis at the time of Shearer's 2000 trial that anything Sherman testified would have been correct and that if she testified, she would only create problems for the defense. Ms. Tweedy went on to testify that she believed that she told Marilyn Brenneman, the prosecutor, approximately the same thing, that she told Detective Faddis. That is the support for that contention. Thank you. Now, as to the contention that counsel was ineffective, and I fall back on Harrington v. Richter here. The issue is not whether counsel performed reasonably under Harrington, but whether the state court decision was objectively reasonable as to those issues. If Ms. Tweedy had, in fact, testified, her credibility would have been as destroyed at the trial court as it was in the federal court evidentiary hearing. And I'm speaking specifically of the fact that Ms. Tweedy's report ostensibly had the signatures or did contain signatures of allegedly Officers Potts and George Smith. But as we discovered at the evidentiary hearing, based on the testimony of those former Redmond police officers, they did not sign Tweedy's report. And I asked them those questions repeatedly. Did you sign this report? And the answer was repeatedly, no, I did not. So if Tweedy had, in fact, testified, and Scheer is contending that she would have made all the difference, the jury would have found, as Judge Donahue found, Magistrate Judge Donahue found in the evidentiary hearing, that she had very limited credibility. I'm not suggesting how those signatures got on there. I'm simply reiterating the court's finding that neither of those officers ever signed that report, even though Tweedy indicated that they had. Well, obviously, you pointed out the AEDPA standard, and that's quite, you know, it gets, you get a double lens there, so it becomes quite deferential. But I believe Appellant is claiming that there's a reason that the AEDPA deference should not apply. Yes, Your Honor. Can you address that? I can. Judge Donahue determined that the Washington Supreme Court Commissioner's decision was essentially contrary to the Brady standard, essentially that the Washington Supreme Court Commissioner's decision was contrary to Brady because it limited Brady only to the prosecutor possessing information. As we know, Brady and Strickler and Kyles goes on to repute whatever the law enforcement has to the prosecutor. And Judge Donahue performed a de novo analysis in light of that fact. However, even assuming Judge Donahue was correct in finding that the court commissioner's analysis based on Brady was contrary to Brady, Scheer loses based on the de novo analysis by the district court. And even if the court doesn't believe that the court commissioner's decision was contrary to Brady, then AEDPA would apply, and Scheer still has the burden of showing that the state court's decision was objectively unreasonable. So in either case, whether AEDPA applies or it doesn't apply and the court goes with the district and reviews the district court's de novo review, Scheer loses in either case. But your view, but your perspective is that AEDPA applies. That's correct. Because what's wrong with his argument? What's wrong with his argument is that, in my view, Judge Donahue and Judge Martinez, which adopted the report and recommendation, may have read into the Washington Supreme Court Commissioner's opinion by saying that Brady was limited to the prosecutor. The court commissioner simply didn't address law enforcement as well. He loses because neither the prosecutor nor law enforcement ever possessed Tweedy's report. That just ends the Brady analysis. So regardless of whether AEDPA applies or not, he loses under either scenario. It sounds to me like you're not really arguing with the magistrate judge's findings here. I'm not, Your Honor. But I'm simply indicating Scheer loses if de novo review is followed. Does it make a difference? It doesn't make a difference. As you see it, petition loses either way. That's correct. That's correct, Your Honor. We would respectfully ask that this court affirm the decision of the district court. Unless there is further questions from either of my colleagues. Do you have any questions, Judge Head? Okay, thank you. No, I don't. Thank you. Thank you very much. The question came up, Your Honor, of why didn't the state put Richard Sherman on the stand? I think the answer to that is that on its face, his report did not appear to support the state's case. I think it was a surprise. Well, we can't really speculate about that, though, can we? We don't know for sure why the prosecutor chose not to put him on. Here's what we do know about it. No, no, except can't you draw at least this inference that if the evidence was favorable to the prosecution, would have strengthened his case, the prosecutor probably would have put him on, right? She certainly put on everything else she could think of, a hundred witnesses, most of them talking about nothing more significant than that Steve pressured Jamie to go bowling when she didn't feel like it. So, yes, I think we could assume that if she thought it was going to help her case, she would have put it on. Okay, so then the prosecutor thought it, and then Counsel for Mr. Scherr thought it, and then things just sort of blew up on cross. Right. I mean, people blurt things out. Well, but this was hardly blurting things out. I mean, this is a question of we know what the report says, we know what the dogs did, but the defense never asks him, never asks Sherman, but what do you conclude from that? And he gleefully told the, once he had been approached, he gleefully ran to the prosecutor and told her, you know, exactly what he would conclude. I do want to clarify a thing about, one thing about the discussions with Jan Tweedy after Sherman's testimony. At the evidentiary hearing, contrary to what she said on the record at trial, at the evidentiary hearing, Prosecutor Brenneman was absolutely clear that she did not discuss the substance of what Tweedy's testimony could be at all, and Tweedy did not have her report in front of her. Ms. Brenneman was absolutely clear that the whole discussion was about how Ms. Tweedy did not wish to travel to Seattle to testify because she was recovering from some surgery, and nothing of substance was discussed. That is quite different from what Ms. Brenneman strongly implied on the record when she scared the defense off of doing a deposition of Tweedy. And that, of course, is my misrepresentation claim, which is, as I acknowledge, an uncertified claim at this point. As far as the trial testimony being voluminous, I would simply point the Court to my reply brief on the sufficiency claim, where I point out how these points that the Court of Appeals made were not meaningful points as far as proving guilt. For example, the Court of Appeals said, well, there was a stain that looked like blood. Well, that may be true, but there was also Detective Conrad who came into the house. He is specially trained in using chemical tests for blood. He examined all the stains in the house and found they weren't blood. So it's totally unreasonable to say, well, he must be guilty because there was a stain that looked like blood, when we know it wasn't blood. Well, the problem with a circumstantial case is you don't get to parse it out. At the end of the day, when we review it for sufficiency, we have to look at everything, every single piece of it and every inference a jury could have taken. And sufficiency of the evidence is, as you know, is a pretty tough rock to push uphill. I understand that, Your Honor, but as you noted, it also goes very strongly to the Strickland test. As Justice O'Connor said, in Strickland itself, in a case that is only weakly supported by the evidence, even minor errors by counsel may be outcome determinative. Just as one last point, I'm still surprised that the State would rely on the supposed testimony of Mr. Kasten that Steve Shearer showed him where Jamie's car was before the police found it. Mr. Kasten had given four different statements to the police over the course of ten years without ever mentioning that extraordinary fact. It was only shortly before trial. But all that came out during the trial, right? The jury had all of his statements, the fact that he didn't come up with it until the last minute, and they still convicted your client, right? Right, and I submit because of the dog-tracking evidence, not because of Jeffrey Kasten's incredible testimony. All right, your time is up. Thank you for your argument. Both of you, thank you for your argument. This matter will stand submitted.
judges: Hug, Tashima, Callahan